### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 21-cr-94 (PAM/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Carlos Vazquez, | |
| Defendant. | |

Thomas M. Hollenhorst, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Lisa M. Lopez, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Carlos Vazquez's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, ECF No. 33. This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Paul A. Magnuson, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on October 17, 2023. ECF No. 38. Thomas Hollenhorst appeared on behalf of the United States of America (the "Government") and Lisa M. Lopez appeared on behalf of Defendant. Post-hearing briefing is now complete, and this motion is ripe for a determination by the Court.

1

## II. FINDINGS

The Court heard testimony from Agent Anthony Fletcher with the Minnesota Bureau of Criminal Apprehension ("BCA")[1] and Trooper Anthony Mains with the Minnesota State Patrol. At the hearing, the Government offered and the Court received: Government Exhibit 1, squad car video from the front of Trooper Mains' vehicle on June 15, 2019, capturing the traffic stop and search in question; Government Exhibit 2, squad car video from the back seat of Trooper Mains' vehicle the same day; and Government Exhibits 3 through 6, audio recordings of phone calls between Agent Fletcher and Defendant that took place the same day, prior to the stop of Defendant's vehicle.

### A. Events Leading Up to June 15

Agent Fletcher has been a law enforcement officer for approximately 20 years. Tr. 17:14-15, ECF No. 45.[2] He has been with the BCA for approximately eight years and is a member of the Drug Enforcement Administration Task Force ("DEA Task Force"). Tr. 17:6-10, 16-18. As a member of the DEA Task Force, Agent Fletcher "investigate[s] federal drug[-]trafficking crimes." Tr. 17:22-24.

In or around June 2019, Agent Fletcher received information from a confidential informant who had provided reliable information in the past. Tr. 18:4-7, 13-18, 20:7-10,

---

[1] Agent Fletcher's exact title is not clear from the record. The parties have both characterized him as an "agent." *See, e.g.*, Def. Mem. in Supp. at 2-3, ECF No. 46; Gov't Post-Hearing Mem. in Opp'n at 2-12, No. 53; *cf.* Gov't Post-Hearing Mem. in Opp'n at 2 ("Special Agent"). *But see* Def. Mem. in Supp. at 1 ("DEA Task Force Officer"). Consistent with the parties, the Court also uses "Agent." In doing so, the Court intends no disrespect to Agent Fletcher if his full title as a law enforcement officer with the BCA differs from the shorthand employed here.
[2] The transcript of the motions hearing has been temporarily sealed to allow for the process of redacting any personal identifiers. *See generally* D. Minn. LR 5.5; ECF No. 40. Defendant filed a notice of intent to request redaction and a subsequent statement of redaction regarding address information. *See generally* ECF Nos. 41, 44. The Court cites to the redacted version of the transcript. *See generally* ECF No. 45.

39:15-25.  The informant told Agent Fletcher that he[3] was "aware of a source of supply for narcotics, . . . likely in Mexico, that was coordinating drug shipments to the State of Minnesota."  Tr. 18:8-12.  The informant offered to "pass an undercover phone number to the source of supply," with "the ultimate goal being to receive a shipment of narcotics from this unknown person."  Tr. 19:3-8; *see* Tr. 40:1-14.  Agent Fletcher provided the informant with a phone number to be used by an undercover law enforcement officer posing as "Gary."  Tr. 19:9-14, 25:22-25.  The undercover phone number was solely for the purposes of this investigation.  Tr. 24:6-8, 44:20-45:3.  The goal was to have the informant tell the supplier that this phone number "belonged to a trusted drug customer who was willing to receive large shipments of narcotics," specifically methamphetamine and "[l]arger quantities in excess of 30, 40, 50 pounds."  Tr. 19:15-20:6.  Agent Fletcher was in fact serving undercover as "Gary."  Tr. 20:25-21:4, 25:22-26:5.  On cross examination, Agent Fletcher testified that he did not receive a name or description of the source of supply.  Tr. 40:9-25.

At some point prior to June 15, the informant told Agent Fletcher that he "would likely be receiving some type of contact, either [a] phone call or text message."  Tr. 21:18-21.  Agent Fletcher subsequently reached out to Trooper Mains, who is "known to law enforcement as being involved in interdiction-type traffic stops."  Tr. 21:8-17, 23:4-8.  Agent Fletcher "advised [Trooper Mains] of the background of the case and that law enforcement was expecting some type of activity either that day or over the weekend

---

[3] As was done by the Government at the hearing and in post-hearing briefing, the Court refers to the informant using masculine pronouns regardless of the true gender of the informant.  Tr. 18:22-24; Gov't Post-Hearing Mem. in Opp'n at 2 n.1.

involving a shipment of narcotics, which would likely be some type of drug courier." Tr. 21:8-17. Agent Fletcher told Trooper Mains that "he would be meeting with a drug courier that was likely in possession of a large quantity of methamphetamine, approximately 40 pounds." Tr. 1-4. Agent Fletcher asked Trooper Mains "if he would be available for law enforcement to be on standby in the event that we required his assistance." Tr. 21:25-22:4. The plan was for Trooper Mains to pull over the vehicle the drug courier was driving "after getting the drug courier to move from one spot to another." Tr. 42:17-43:2. Agent Fletcher testified that he personally was not in a position to make the stop because he was acting in an undercover capacity and use of the Minnesota State Patrol helped to isolate the stop away from plainclothes officers and unmarked law enforcement vehicles. Tr. 43:8-44:1. The preference was for the Minnesota State Patrol to perform "a traffic stop based on their own independent probable cause, if they can find it." Tr. 44:2-9.

## B. Events of June 15

### 1. Contact With Charlie

On June 15, just after 2:30 p.m., Agent Fletcher was contacted on the undercover phone number by a phone number with a Sacramento, California area code. Tr. 20:18-24, 21:5-7, 23:12-14; *see generally* Gov't Ex. 3; Tr. 23-1724. The man identified himself as "Charlie." Gov't Ex. 3 at 00:00-06. Charlie told "Gary" that Chico[4] had told him (Charlie) to call Gary. Gov't Ex. 3 at 00:08-09. Charlie said that he was on his way from California to bring Gary "the stuff." Gov't Ex. 3 at 00:09-12; *see* Tr. 46:1-2. Charlie

---

[4] It is a bit unclear if the supplier goes by Chico or Chito.

offered to text Gary the address where they would meet, telling him it was a restaurant near the Mall of America. Gov't Ex. 3 at 00:15-36; *see also* Gov't Ex. 3 at 1:06-16. Charlie told Gary that he would be there around 5:30 p.m. as he was still driving. Gov't Ex. 3 at 00:38-1:05. Charlie told Gary that he had a box for him that "looks like a present box," "a present." Gov't Ex. 3 at 1:24-32. Charlie told Gary he was "just going to give [him] a present," so that it was "not something that is going to look like awkward or nothing, you know?" Gov't Ex. 3 at 1:36-49.

Agent Fletcher testified that, based on the informant telling him to expect some type of contact, he suspected this call was someone bringing narcotics to Minnesota. Tr. 23:25-24:5. Agent Fletcher testified that he understood the term "the stuff" to refer to narcotics and "oftentimes those involved in trafficking of narcotics will use code or slang or they're not going to spell out exactly what they're bringing." Tr. 26:11-22. Agent Fletcher additionally testified that he interpreted the use of a present as the means of delivery to mean that there was no concern "with the transaction sticking out in any way, that I could be relaxed about it and there shouldn't be any issues with the observation that there may be drugs or some type of illicit activity going on." Tr. 27:20-28:4. Agent Fletcher testified that he also received two short text messages at the undercover number, essentially the name of the restaurant and the address. Tr. 58:9-20. Agent Fletcher relayed to Trooper Mains that "[t]he drug courier had contacted [him], said that he had the stuff, and had wanted to meet me." Tr. 61:2-5. Agent Fletcher also told Trooper Mains where the meet was to take place. Tr. 28:12-15, 59:24-60:8.

Charlie called Gary again to tell him that he had arrived at the meeting place. Tr.

29:2-11; *see generally* Gov't Ex. 4.  Charlie told Gary that he was in a gray Ford and wearing a hat.  Gov't Ex. 4 at 00:25-38; *see* Tr. 30:18-24.  Gary told Charlie that he was driving a black Escalade and was around eight to ten minutes away.  Gov't Ex. 4 at 00:12-22; *see* Tr. 29:21-24; *see also* Tr. 46:23-25.  Gary also told Charlie that he had received a call from "Chico's people" and "they don't want us here because of all the cameras."  Gov't Ex. 4 at 00:40-1:21.  Gary proposed that Charlie follow him to a nearby hotel.  Gov't Ex. 4 at 00:51-1:22.

Agent Fletcher testified that a description of Charlie's vehicle was shared with law enforcement prior to his (Agent Fletcher's) arrival at the meeting place, so other law enforcement officers conducting surveillance were able to identify the vehicle in the lot. *See* Tr. 30:8-31:11.

Gary called Charlie as he was pulling into the meeting place.  *See generally* Gov't Ex. 5.  Gary confirmed that Charlie could see him and told Charlie to follow him to a local hotel.  Gov't Ex. 5 at 00:16-1:05; *see* Tr. 31:9-12.  Charlie responded that he could see Gary and would follow him.  Gov't Ex. 5 at 00:25-1:11; *see* Tr. 31:9-12.  Charlie was driving a gray Ford Fusion.  Tr. 471-3.  Charlie proceeded to follow Gary out of the parking lot.  Tr. 31:9-13, 47:8-19.

Agent Fletcher testified that moving the meeting place to a hotel because of a concern for cameras was a ruse and "part of [the] operational plan to get [the courier] to move from A to B, to have him follow me."  Tr. 31:13-20, 46:8-16.  Agent Fletcher testified that the plan was that Gary would not meet up with Charlie and the ensuing drive would give Trooper Mains the opportunity to conduct a traffic stop.  Tr. 31:1-10.

Another call took place between Gary and Charlie while they were driving to the new meeting place.  *See generally* Gov't Ex. 6; *cf.* Gov't Ex. 1 at 00:00-3:46 .  During the call, Charlie told Gary that he had "a cop behind him."  Gov't Ex. 6 at 00:09-10.  Just over a minute later, Charlie tells Gary that he is being pulled over and sirens can be heard in the background.  Gov't Ex. 6 at 1:18-28.

### 2. Traffic Stop

Trooper Mains has been with the Minnesota State Patrol for approximately 10 years.  Tr. 65:3-8, 86:12-14.  Trooper Mains utilizes a narcotics-detection dog named Dutchie in the performance of his duties.  *See* Tr. 64:23-65:2, 21-66:4, 67:21-23.  Dutchie is trained to detect methamphetamine, heroin, cocaine, crack, and psilocybin mushrooms.  Tr. 67:21-68:2.  Dutchie is certified and he and Trooper Mains "do yearly national certifications" and engage in a minimum of 16 hours per month of "maintenance training."  Tr. 66:5-16, 67:10-16.  Dutchie was with Trooper Mains on June 15.  Tr. 66:2-4.

Trooper Mains testified that he received a phone call from Agent Fletcher on June 15, "inform[ing Trooper Mains] that he had a potential package coming in from an unknown suspect and that person was driving an unknown vehicle, at which time he would attempt to have that person move from point A to point B."  Tr. 68:5-12; *see also* Tr. 92:9-93:9, 95:10-20.  Trooper Mains testified that he had additional conversations with Agent Fletcher that day regarding locations and vehicle descriptions, communicating with him via radio.  Tr. 68:13-17, 93:10-12, 95:25-6, 107:10-17; *see* Tr. 95:10-24.  Trooper Mains testified that "[i]t was kind of an ongoing, fast-moving deal,

7

but [he] was always in contact with [Agent Fletcher]."  Tr. 68:17-18; *see* Tr. 49:18-51:11, 57:6-13.  Trooper Mains described Agent Fletcher as his "partner" that day.  Tr. 69:2-4, 102:21-22; *see* Tr. 108:22-23 (Agent Fletcher and Trooper Mains were "working as a team").  On cross examination, Trooper Mains testified that he was "not privy" to the facts regarding why Agent Fletcher thought there was a large quantity of drugs in the vehicle or why Agent Fletcher thought Charlie/Defendant was transporting the drugs.  Tr. 96:7-14.  Trooper Mains agreed, however, that if he wanted more details he could have asked Agent Fletcher and they would have been provided.  Tr. 108:15-109:1; *see* Tr. 111:13-23, 112:13-113:5.

On June 15, Trooper Mains "set up in the area of the Mall of America" and "located the vehicle that . . . Agent Fletcher had observed in a parking lot, a business parking lot."  Tr. 69:5-10.  Trooper Mains conducted a traffic stop of the gray Ford Fusion driven by Charlie, who was subsequently identified as Defendant, a little bit before 5:30 p.m.  Tr. 70:12-17; *see* Gov't Ex. 1 at 00:00-4:55; Tr. 74:21-75:2.

Trooper Mains testified that he had an independent basis aside from the information provided by Agent Fletcher for making the traffic stop: it was raining and the vehicle did not have its headlights on while driving in the rain as required by Minnesota law.  Tr. 71:1-24, 110:2-3, 110:13-14; *see* Minn. Stat. § 169.48, subd. 1(a)(2) (requiring a vehicle operating on a highway to "display lighted headlamps, lighted tail lamps, and illuminating devices" "at any time when it is raining, snowing, sleeting, or hailing").  Trooper Mains acknowledged that it was raining "[o]n and off" on June 15, stating there were "sporadic showers throughout the area" during the course of the afternoon.  Tr.

8

71:25-72:5; *see also* Tr. 73:14-18.  Trooper Mains agreed that there was not a lot of rain at the time of the stop.  Tr. 72:10-16, 100:25-101:13.  Trooper Mains testified that he could tell it was raining based on "[t]he drops on [his] windshield."  Tr. 72:17-20.  On cross examination, Trooper Mains acknowledged that he had inadvertently written the wrong subdivision in his report, referring to subdivision 1(a)*(3)* of Minn. Stat. § 169.48, regarding displaying vehicle lights in situations where visibility is impaired, instead of subdivision 1(a)*(2)*.  Tr. 98:19-100:4, 110:5-7; *see* Minn. Stat. § 169.48, subd. 1(a)(3) (vehicle lights shall be displayed "at any other time when visibility is impaired by weather, smoke, fog or other conditions or there is not sufficient light to render clearly discernible persons and vehicles on the highway at a distance of 500 feet ahead").

Reviewing Trooper Mains' forward-facing squad cam video from June 15, sprinkles appear to begin landing on Trooper Mains' windshield around the 2:41 mark. *See* Gov't Ex. 1 at 2:38-41.  Additional sprinkles can be seen landing around the 3:09 and 3:25 marks.  *See* Gov't Ex. 1 at 3:00-25.  At the 3:27 mark, someone can be overheard saying that Trooper Mains has "got the lights on."  Gov't Ex. 1 at 3:25-29.  The amount of rain present at this point in time is less than, for example, the rain that occurs later in the stop, triggering Trooper Mains' windshield wipers.  *See, e.g.*, Gov't Ex. 1 at 5:31-6:27, 7:46-39; *compare with, e.g.*, Gov't Ex. 1 at 9:45-12:00 (steady rain).  When Trooper Mains gets out to talk to Defendant, the squad cam video captures him telling Defendant that he was pulled for not using his headlights in "inclement weather."  Gov't Ex. 1 at 5:00-16; *see* Tr. 75:3-6.

Trooper Mains asked Defendant some general questions about his itinerary and

with whom he was traveling. *See generally* Gov't Ex. 1 at 5:08-8:23. Defendant told Trooper Mains that he and his wife had driven from California over the course of two days and just arrived in Minnesota for purposes of visiting the Mall of America. Gov't Ex. 1 at 5:15-26, 5:576-6:07; *see* Tr. 76:18-23. When Trooper Mains asked Defendant where his wife was, Defendant stated she went to a nearby store because Defendant needed some medication for his acid reflux. Gov't Ex. 1 at 5:28-43. Defendant told Trooper Mains that they were in town until Monday (June 15 was a Saturday). Gov't Ex. 1 at 5:50-54; Tr. 76:11-12. Defendant also told Trooper Mains that they were not going to drive back; rather, they planned on leaving the car here and flying back to California. Gov't Ex. 1 at 7:08-19.

Trooper Mains testified that, when he was back in his squad preparing the warning ticket, he looked at the rental agreement provided by Defendant and noted that the vehicle had been rented "two days prior in California and was due back" on Sunday in Minneapolis. Tr. 76:4-17.

Trooper Mains came out with the warning ticket roughly four and a half minutes later. *See generally* Gov't Ex. 1 at 8:23-12:42. Trooper Mains asked Defendant to get out of the car so that he could explain the warning to him. Gov't Ex. 1 at 12:42-13:17. Trooper Mains handed Defendant the warning approximately 30 seconds later after explaining it. *See generally* Gov't Ex. 1 at 12:42-13:17. Trooper Mains then began to ask Defendant additional questions, including which hotel he was staying at. Gov't Ex. 1 at 13:18-36. Trooper Mains again asked Defendant where he had dropped his wife off. Gov't Ex. 1 at 13:37-38. This time, Defendant told Trooper Mains that he had dropped

his wife off at a restaurant (the initial meeting place) and he was on his way to pick up medication for his acid reflux. Gov't Ex. 1 at 13:37-14:00.

Trooper Mains asked Defendant whether there was anything in the car that he needed to be concerned about. Gov't Ex. 1 at 14:01-06. Defendant responded that there was not. Gov't Ex. 1 at 14:01-06; *see* Tr. 76:24-77:1. Trooper Mains specifically asked Defendant whether there was any drugs, methamphetamine, cocaine, heroin, large amounts of United States currency, or weapons in the vehicle. Gov't Ex. 1 at 14:11-28. Defendant denied the presence of each item. Gov't Ex. 1 at 14:11-28.

Trooper Mains then told Defendant that parts of his story were not "jiving with [him]" and asked Defendant for permission to search the vehicle. Gov't Ex. 1 at 14:29-14:34. Defendant consented to the search of his vehicle. Gov't Ex. 1 at 14:29-50; *see* Tr. 78:12-16; *cf.* Tr. 78:17-19, 22-79:5. Trooper Mains asked Defendant whether everything in the vehicle belonged to him. Gov't Ex. 1 at 15:12-15. At first, Defendant said, "No." Gov't Ex. 1 at 15:12-15. Trooper Mains asked what items in the vehicle belonged to him. Gov't Ex. 1 at 15:16-20. Defendant started telling Trooper Mains there were beverages in the car and a red bag, but concluded by saying that everything in the vehicle belonged to him or his wife. Gov't Ex. 1 at 15:16-50; *see* Tr. 77:2-10. Trooper Mains then asked Defendant to sit with another law enforcement officer on the scene. Gov't Ex. 1 at 15:51-58.

Trooper Mains brought out Dutchie, who began to search the vehicle while Trooper Mains asked him, somewhat ironically in this case, where his gift was. Gov't Ex. 1 at 16:17-18:50; *see* Tr. 78:20-22. Trooper Mains can then be heard praising

Dutchie and putting him back in the squad.  Gov't Ex. 1 at 18:51-19:05.  Trooper Mains testified that Dutchie alerted to the outside of the driver's window and then proceeded to jump through the window, jump into the back seat of the vehicle, and ultimately "went into a final indication along the back seat's seam in the middle."  Tr. 79:6-11; *see* Tr. 80:7-82:24.  Trooper Mains testified that he concluded from Dutchie's final indication that there were "for sure narcotics in or around the rear of the vehicle."  Tr. 82:25-83:3.

Trooper Mains told Defendant that Dutchie alerted on his vehicle.  Gov't Ex. 1 at 19:19-23.  Trooper Mains told Defendant that this was an opportunity to be honest with him.  Gov't Ex. 1 at 19:24-25.  Defendant again denied having anything in his vehicle, telling Trooper Mains that he and his wife had just rented the car.  Gov't Ex. 1 at 19:24-45.  Trooper Mains told Defendant he was being detained while law enforcement searched the vehicle.  Gov't Ex. 1 at 19:46-20:20.

Trooper Mains and another law enforcement officer searched the vehicle*.  See generally* Gov't Ex. 1 at 20:57-34:51.  Eventually, they got to the trunk.  Gov't Ex. 1 at 21:57-22:03.  In the trunk, among other things, was a large, heavy, square box wrapped like a present.  Gov't Ex. 1 at 21:59-22:15; *see* Tr. 83:9-12; *see also* Tr. 85:24-86:1 (Trooper Mains first learned about the present when he opened the trunk).  Trooper Mains came back and asked Defendant what was in the present.  Gov't Ex. 1 at 22:16-25.  Defendant told Trooper Mains that it was a present that they brought for "a guy," who was a friend of [his] friend."  Gov't Ex. 1 at 22:16-34.  Defendant told Trooper Mains that he did not know who the recipient was and had been asked to bring the present on his trip.  Gov't Ex. 1 at 22:31-46.  Trooper Mains told Defendant that he was going to open

the present.  Gov't Ex. 1 at 23:06-09.

Trooper Mains tore the packaging off the top of the box and opened it up.  *See* Gov't Ex. 1 at 23:15-23:44, 32:58-33:15; Tr. 83:13-14.  He then came back to the squad and told Defendant that he was under arrest as there was a "large quantity of drugs in that present."  Gov't Ex. 1 at 23:45-24:02; *see* Tr. 83:13-15.  Ultimately, approximately 17 kilograms, or about 40 pounds, of methamphetamine was recovered from Defendant's vehicle.  Tr. 37:3-8; *see also* Tr. 83:15-16.

When Trooper Mains got back into his squad to transport Defendant to jail, Defendant asked Trooper Mains if he could speak with him.  *See* Gov't Ex. 1 at 44:00-23. Trooper Mains advised Defendant of his *Miranda* rights while they were still in the parking lot.  Gov't Ex. 1 at 45:58-46:50; *see* Tr. 84:5-7.  Trooper Mains asked Defendant whether he understood those rights.  Gov't Ex. 1 at 46:51-53.  Defendant stated, "Yes." Gov't Ex. 1 at 46:54.  Defendant then made statements to Trooper Mains while he was being transported to jail.  *See generally* Gov't Ex. 1 at 47:01-1:04:00; Gov't Ex. 2 at 00:-14:42.

At the hearing, Trooper Mains was asked about his assessment of Defendant's ability to speak English.  Tr. 84:17-21.  Trooper Mains testified that Defendant spoke English "very well" and seemed to track his questioning.  Tr. 84:17-23.  Trooper Mains testified that Defendant's answers were responsive to the questions being asked.  Tr. 84:24-85:1.

## III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law.

Defendant moves for suppression of evidence obtained as a result of the stop and search of his vehicle, including statements made while he was being transported to jail.[5] "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting U.S. Const. amend. IV). "[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).

### A.  Probable Cause Existed to Stop and Search the Vehicle

Acknowledging that "pretextual stops do not run afoul of the Fourth Amendment," Defendant argues that the claimed pretext in this case—failure to display vehicle lights during "rainy, inclement" weather—was not present and therefore the stop was invalid because no traffic violation occurred.  Def. Mem. in Supp. at 1.  Defendant additionally argues that Trooper Mains did not have reasonable suspicion to extend the stop beyond issuing the warning, and therefore the expansion of the stop was improper.

The Government responds that Defendant's failure to display his vehicle lights while it was raining, even if that rain was "light sprinkling," violated Minnesota law,

---

[5] At the hearing, Defendant confirmed that these statements rise and fall with the analysis of the stop.  Tr. 11:15-12:8.

providing Trooper Mains with probable cause to perform a traffic stop. Gov't Post-Hearing Mem. in Opp'n at 17; *see State v. McCabe*, 890 N.W.2d 173, 176-77 (Minn. Ct. App. 2017) ("McCabe's characterization of the rainfall as 'sprinkling' does not persuade us to reach a different conclusion. [Section 169.48] does not define 'raining,' but common usage provides that rain is water falling from the sky in drops. And 'sprinkling' is also commonly accepted as a description for light rain. 'Raining' therefore necessarily includes "sprinkling" for statutory purposes." (citations omitted)). The Government contends, however, that a determination of whether a traffic violation in fact occurred need not be made "because law enforcement was fully justified in conducting a traffic stop based upon reasonable suspicion that . . . [D]efendant was engaged in a serious drug trafficking crime" based on the collective knowledge and coordinated efforts of Agent Fletcher and Trooper Mains. Gov't Post-Hearing Mem. in Opp'n at 17-18. The Government further contends that there was probable cause to stop and search Defendant's vehicle and therefore it was permissible for law enforcement to do so under the automobile exception.

Here, the Court concludes that there was probable cause to believe the vehicle contained contraband or other evidence of a crime, and therefore was subject to being stopped and searched. "A traffic stop constitutes a seizure under the Fourth Amendment, and must be supported by either probable cause or an articulable suspicion that a violation of law has occurred." *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017) (quotation omitted). Further, "[t]he automobile exception permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause

to believe that the vehicle contains contraband or other evidence of a crime." *United States v. Vittetoe*, 86 F.4th 1200, 1203 (8th Cir. 2023) (quotation omitted); *see also, e.g.*, *United States v. Farrington*, 42 F.4th 895, 899 (8th Cir. 2022); *United States v. Winarske*, 715 F.3d 1063, 1068 (8th Cir. 2013).  Law enforcement "could [thus] stop and search the vehicle driven by [Defendant] without a warrant as long as they had probable cause to believe that he was transporting drugs." *United States v. Amaya*, 52 F.3d 172, 174 (8th Cir. 1995); *see Rowe*, 878 F.3d at 628-29; *United States v. Morales*, 238 F.3d 952, 953 (8th Cir. 2001).

"[P]robable cause exists, when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Vittetoe*, 86 F.4th at 1203.  Whether probable cause exists "is an objective" inquiry.  *Id.*  "Probable cause is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quotation omitted).

"Probable cause for the stop and search of . . . [a] vehicle may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information within knowledge of the officer(s) on the scene if there is some degree of communication." *Rowe*, 878 F.3d at 628.  This communication requirement serves to distinguish law enforcement officers functioning as a team from "officers acting as independent actors who merely happen to be investigating the same subject." *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001); *accord United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011).  "How much information must one officer convey to another in order to invoke the collective knowledge doctrine?

16

In the Eighth Circuit, the answer is very little."  *United States v. Robinson*, 634 F. Supp. 3d 568, 579 (W.D. Ark. 2022).  The Eighth Circuit "ha[s] never required that all the relevant collective knowledge of the team be communicated to the officer who made the stop, the arrest, or the search at issue."  *Robinson*, 664 F.3d at 704.

At the time of the traffic stop and search of the vehicle, the collective knowledge of Agent Fletcher and Trooper Mains, who were working as a law-enforcement team, was sufficient to support probable cause that the vehicle driven by Defendant was carrying narcotics in a gift-wrapped box, resembling a present.  A confidential reliable informant told Agent Fletcher that he would pass an undercover phone number to his narcotics supplier for purposes of arranging a shipment of narcotics.  The confidential reliable informant was provided with an undercover phone number for "Gary," which was really Agent Fletcher operating in an undercover capacity.  The undercover phone number was used solely in connection with this investigation.  At some point prior to June 15, the confidential reliable informant told Agent Fletcher to expect to be contacted. Agent Fletcher then advised Trooper Mains that he was anticipating a meeting with a drug courier in the next few days, who was likely in possession of a large quantity of methamphetamine.  On June 15, Agent Fletcher was contacted on the undercover phone number by a phone number with a Sacramento, California area code by a man who identified himself as "Charlie."  Charlie told Agent Fletcher that Chico told him (Charlie) to call Gary and that he was on his way from California to bring Gary "the stuff." Charlie provided Agent Fletcher with the name and address of a meeting place, a particular restaurant.  Charlie also told Agent Fletcher that he had a gift-wrapped box for

17

him that resembled a present, so it would not appear suspicious to anyone observing the transaction. Agent Fletcher let Trooper Mains know that he had been contacted by the drug courier, who had "the stuff" and gave him the location of the meeting place. When Charlie arrived at the meeting place on June 15, he called Agent Fletcher and told him that he was in a gray Ford and wearing a hat. Agent Fletcher told Charlie that he was in a black Escalade and "Chico's people" had asked him to move the transaction because of cameras at the meeting place, a ruse employed by Agent Fletcher to have the drug courier follow him and give Trooper Mains an opportunity to conduct a traffic stop. A description of Charlie's vehicle was shared with law enforcement, including Trooper Mains. Agent Fletcher called Charlie once he arrived at the meeting place. Agent Fletcher confirmed that Charlie could see him and Charlie agreed to follow him to the new meeting place. Charlie was driving a gray Ford Fusion. Charlie, in his gray Ford Fusion, followed along behind Agent Fletcher's vehicle and was subsequently stopped by Trooper Mains. Under the totality of the circumstances, there was a fair probability that contraband—namely, narcotics in a box gift-wrapped like a present—would be found in the gray Ford Fusion being driven by Charlie. Therefore, there was probable cause to stop and search Defendant's vehicle.[6] *See Rowe*, 878 F.3d at 628-29; *Morales*, 238 F.3d at 953; *see also United States v. Castaneda*, 438 F.3d 891, 893-94 (8th Cir. 2006).

Defendant argues that Trooper Mains received little, particularized information from Agent Fletcher that would reasonably warrant suspicion that he (Defendant) was

---

[6] And because there was probable cause to stop and search the vehicle, the Court need not and does not reach whether a traffic violation in fact occurred, whether there was reasonable suspicion for Trooper Mains to expand the scope of the stop, or whether Defendant consented to the search of his vehicle.

engaged in criminal behavior. *See, e.g.*, *United States v. Betts*, 88 F.4th 769, 773 (8th Cir. 2023) ("An officer may conduct other unrelated checks into criminal activity beyond the traffic infraction, but he may not do so in a way that prolongs the stop, absent reasonable suspicion. In other words, if an officer's unrelated investigations extend the traffic stop beyond the time reasonably required to achieve the mission of issuing a ticket, he must have reasonable suspicion of some other criminal activity." (quotations and citations omitted)). Here, the Court need not decide whether there was reasonable suspicion to expand the scope of the traffic stop because probable cause existed to stop and search Defendant's vehicle regardless of Trooper Mains' stated reason for the stop. *See Rowe*, 878 F.3d at 628-30; *see also United States v. Wilson*, No. 5:18-CR-50092-2, 2019 WL 3322082, at *5 (W.D. Ark. July 24, 2019).

In any event, it is undisputed that Trooper Mains was not acting independently. *See* Def. Mem. in Supp. at 11 ("Of course, the reason why Trooper Mains was suspicious of criminal activity is because of what [Agent] Fletcher conveyed to him prior to the traffic stop. Instead of his own 'particularized, objective facts,' [Trooper] Mains' testimony underscored that the reason he suspected [Defendant] of possessing narcotics (and thus the reason why he expanded the stop) was based on representations [Agent] Fletcher made about his own investigation."); *Robinson*, 664 F.3d at 704. The communication between Agent Fletcher and Trooper Mains prior to and on the day of June 15 reflects that they were functioning as a team at the time of the stop and subsequent search of Defendant's vehicle and therefore Agent Fletcher's knowledge is imputed to Trooper Mains under the collective knowledge doctrine. *See Robinson*, 664

F.3d at 704; *Gillette*, 245 F.3d at 1033-34; *see also Rowe*, 878 F.3d at 628-30.

**B.  Probable Cause Existed to Unwrap and Open the Gift-Wrapped Box**

Searches conducted pursuant to the automobile exception "may lawfully reach 'places in which there is probable cause to believe that [contraband] may be found,' including containers discovered within the automobile."  *Farrington*, 42 F.4th at 899 (alteration in original) (quoting *California v. Acevedo*, 500 U.S. 565, 579-80 (1991)); *see also, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 347 (2009) ("If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-21, 102 S. Ct. 2157, 72 L.Ed.2d 572 (1982), authorizes a search of any area of the vehicle in which the evidence might be found."); *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016) (trunk); *United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013) (containers).

Relying on *United States v. Jones*, 501 F. Supp. 2d 1284 (D. Kan. 2007), Defendant asserts that the unwrapping and opening of the gift-wrapped box was unlawful because it was done without his consent and without a warrant and exceeded any consent given to generally search the vehicle.  *Jones* considered whether general consent given to search a vehicle included consent to open a gift-wrapped package found in the trunk.  501 F. Supp. 2d at 1299-1303.

*Jones* is inapposite here.  In this case, law enforcement had probable cause to search the gift-wrapped box.  "The scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted.  Rather, it is defined by the object of the search and the places in which there is probable cause to

believe that it may be found." *Ross*, 456 U.S. at 824; *accord Acevedo*, 500 U.S. at 579-80.  For the reasons stated above and as imputed to Trooper Mains based on the collective-knowledge doctrine, there was probable cause to believe the gift-wrapped box contained narcotics.  Accordingly, the automobile exception permitted the unwrapping and opening of the gift-wrapped box.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, ECF No. 33, be **DENIED**.

Date: January___10___, 2024                          _____*s/ Tony N. Leung*_____
                                                     Tony N. Leung
                                                     United States Magistrate Judge
                                                     District of Minnesota

                                                     *United States v. Vazquez*
                                                     Case No. 21-cr-94 (PAM/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report

and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.